**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMUNITY CARE FOUNDATION, :
         :
   Plaintiff,    :
         :
  v.       : Civil Action No. 04-1153 (JR)
         :
TOMMY THOMPSON, Secretary, U.S. :
Department of Health and Human :
Services,      :
         :
   Defendant.   :

**MEMORANDUM**

   The Provider Reimbursement Review Board (PRRB), acting pursuant to a delegation of authority from the Secretary of Health and Human Services, decides Medicare reimbursement disputes between health care service providers and the Medicare program.  On May 6, 2004, the PRRB upheld the denial of plaintiff CommunityCare's reimbursement claim for a depreciation loss adjustment on assets CommunityCare disposed of in the 1996 cost year.

   There are no factual disputes in the case.  The sole question before this court is whether, on the facts of this case, a depreciation loss adjustment may be claimed for a provider's interest in a nominal lease.  For the reasons laid out below, I believe the answer is no, and the defendant's motion for summary judgment will accordingly be **granted.**

1. **Background**

  A. Medicare reimbursement

   The Medicare program was established in 1965 under Title VII of the Social Security Act to provide health insurance to the aged and disabled.  42 U.S.C. §§ 1395-1395cc.  Centers for Medicare and Medicaid Services (CMS), neé Health Care Financing Administration (HCFA), administers the Medicare Program.  The Secretary's payment and audit functions under the Medicare program are contracted out to insurance companies, known as Fiscal Intermediaries (FI).  Using the Medicare statute and the interpretive guidelines published by CMS, FI's determine what Medicare owes its providers.  Dkt. #9 at 7.

   At the close of the fiscal year, a provider submits to the fiscal intermediary a report of costs it has incurred during that year.  The report allocates a portion of those costs to Medicare.  42 C.F.R. § 413.20.  The FI reviews the report and determines the total Medicare reimbursement due to the provider.  Dkt. #1 at 4, ¶7.  It publishes the amount in a notice of program reimbursement ("NPR").  A dissatisfied provider may file an appeal with the PRRB within 180 days of the NPR.  See 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

   For providers that own their facilities, depreciation on hospital assets (buildings and equipment) used to service Medicare patients is a reimbursable Medicare expense.  42 C.F.R.

§ 413.134; Dkt. #1 at 4, ¶8.  The FI bases the depreciation
reimbursement, in part, on the ratio of Medicare/Medicaid
patients to a hospital's overall clientele.  If, for example,
one-fifth of a hospital's patients are eligible for Medicare,
Medicare pays one-fifth of the hospital's annual depreciation
costs.  Medicare allows providers to estimate their depreciation
costs using a straight-line method, a declining balance method,
or, in certain situations, a sum-of-the-years' digits method.  42
U.S.C. § 1395f(b)(1); 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R.
§ 413.134.  A depreciable asset's basis is its "historical
cost" – generally, the purchase price.  42 C.F.R.
§ 413.134(a)(3).  Depreciation is calculated annually and
reported in the owner's fiscal year report.  <u>Id.</u>  Medicare's
"fair share" of estimated depreciation is a percentage equal to
the percentage of the provider's assets (buildings and equipment)
used to service Medicare patients.  42 C.F.R. § 413.134(a); Dkt.
#1 at 4, ¶9.

Because the annual percentage was based on estimates,
the 1996 Medicare regulations provided for the recapture (or
payment) of any over- (or under-) payments when a provider/owner
appropriately disposed of a depreciable asset.[1]  Dkt. #1 at 5,

---

[1]     These facts are recited in the past tense because the
1996 regulations no longer exist.  Indeed, the controversy
presented by this case exists only with respect to pre-1997
depreciation claims.  The Balanced Budget Act of 1997
prospectively altered the statutes and regulations governing

¶11.  If the owner disposed of the asset for less than its book value (its net depreciated basis), Medicare deemed a depreciation "loss" to have occurred, 42 C.F.R. § 143.134(b)(9), and provided additional reimbursement to cover the underpayment.  Conversely, if the owner disposed of the asset for more than its book value, the asset had depreciated less than previously estimated, and Medicare recaptured any overpayment it had made on depreciation.  42 C.F.R. § 413.134(f)(1); Dkt. #1 at 5, ¶10.  The regulation only recognized certain forms of disposal as qualified for Medicare recoupment/reimbursement, however: "sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty," 42 C.F.R. 413.134(f), or transfers occasioned through mergers or consolidations between unrelated parties.  42 C.F.R. § 413.134(l)(2)-(3).

Medicare providers that did not own their facilities, but instead held them pursuant to a commercial lease, received Medicare reimbursement for a share of their rental costs.  For providers that held their facilities pursuant to a nominal lease (i.e., one for $1.00 a year), Medicare's Provider Reimbursement Manual (PRM) § 112 treated lessor and lessee as one and the same and reimbursed nominal-lessee providers for a percentage of annual depreciation costs.  PRM § 112.

---

gains and losses on the disposal of depreciable assets. Citations are to the regulation in effect prior to 1997.

B.   Case history

This case arises from a July 1, 1996 Asset Transfer Assumption and Operating Agreement between Medical Center (Bates) and Northwest Health System, Inc. (Northwest).  Dkt. #11-1 at 3. CommunityCare Foundation (CommunityCare), formerly Northwest, is Bates's successor in interest.

Prior to the July 1, 1996 transaction, Bates and Northwest were unrelated corporations, with independent boards of directors, management, and medical staffs.  The two entities did not share any common board members or officers.  Dkt. #1 at 8.

Bates Medical Center, Inc., a 501(c)(3) non-profit corporation located in Bentonville, Arkansas, was created to operate Bentonville's city hospital so that the hospital could more easily attract capital.  The 501(c)(3) held the Medicare provider number and leased the hospital assets from the City of Bentonville for the nominal amount of $1.00 per year.  Dkt. #11-1 at 3.

For the reasons stated above, because Bates was a nominal leaseholder, it was treated as the owner of the hospital and its assets.  Thus, pursuant to 42 C.F.R. § 413.134, Bates was able to claim depreciation on the value of hospital assets in its annual cost reports.  Dkt. #11-1 at 4.

Over time, Bates' financial condition declined, and its leased facility deteriorated.  Bates approached Northwest about a

merger, and a transaction was negotiated.  The agreed "purchase price" was Northwest's assumptions of Bates's liabilities.  Both parties recognized that the Bates facility would require significant rehabilitation and repair to make it a viable, competitive hospital.  Dkt. #11-1 at 4.  The Agreement between Bates and Northwest, executed as of July 1, 1996, stated in part:

> The combination of the Companies is to be accomplished by the <u>transfer of the assets of Bates</u> to Northwest, the assumption by Northwest of the liabilities of Bates, the restructuring of Northwest's Board of Directors and bylaws and by establishing operating and governance procedures for the combined entity ("New Northwest")("the Consolidation").  As a result of the consolidation as provided in this Agreement, Northwest Medical Center and Bates Medical Center (the "Hospitals") will be operated as separate campuses in a system (the "System") owned and operated by New Northwest.

<u>Id.</u> at 3 (emphasis added).  Bates's lease of the hospital property was not transferred to Northwest, however.  Instead, it was terminated, and the City of Bentonville leased the hospital property to Northwest, Dkt. #9 at 906.  Northwest survived Bates, and Bates terminated its Medicare provider number and ceased to exist as a corporate entity.  Dkt. #9 at 8.

Bates filed a terminating Medicare cost report, and Medicare recognized the transaction as a change in ownership (CHOW) for both reimbursement and certification purposes.  Dkt. #9 at 8.  Bates' original final report did not claim a depreciation "loss."  <u>Id.</u> at 9.  The total amount of Bates' liabilities, however, was less than the book value of the

hospital assets.  Dkt. #11-1 at 4.  In 1997, new Northwest
auditors recommended amending the terminating cost report to
claim a depreciation loss, of which Medicare's "fair share" would
be $1,999,443.  Dkt. #11-1 at 6.  In audit adjustments, Arkansas
Blue Cross/Blue Shield ("BC/BS"), Medicare's fiscal intermediary
(FI), disallowed the claimed loss, providing no reasons for the
disallowance, but citing generally to PRM § 132, which covered
"Gains and Losses on Disposal of Depreciable Assets."  Because
BCBS completely rejected the claim, it did not assess the
accuracy of the loss claim.  Dkt. #9 at 906-9.

        After a hearing, the PRRB agreed with the FI,
concluding that Bates was not the "owner of the assets in
question ... [T]he assets in question must be excluded from any
gain/loss calculation relative to the transaction at issue."
When the Administrator of the Centers for Medicare and Medicaid
Services declined to review the PRRB's decision, it made the PRRB
decision a final reviewable agency decision pursuant to 42 U.S.C.
§ 1395oo(f) and 42 C.F.R. § 405.1877.  Id. at 7.  CommunityCare,
as Bates's successor in interest, filed this suit on July 8,
2004.  Dkt. #1.

        2.  **Analysis**

            A.  Standard of Review

        I am to review a PRRB decision using the standard set
out in the Medicare Act, 42 U.S.C. § 1395oo(f)(1), which

expressly incorporates the APA's "arbitrary, capricious, ... abuse of discretion" standard of review.  5 U.S.C. § 706(2)(A); see St. Elizabeth's Med. Ctr. v. Thompson, 396 F.3d 1228, 1233 (D.C. Cir. 2005).  In this case, the issue is whether the agency properly applied its published interpretive rules to the undisputed facts.

Judicial review of an agency's interpretation of its own rules and regulations is highly deferential.  National Med. Enterps., Inc. V. Shalala, 43 F.3d 691, 697 (D.C. Cir. 1995). The Supreme Court, in reviewing the Secretary of HHS's interpretation of Medicare regulations, stated that

> the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.  In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. *This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.*

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)(emphasis added)(internal quotation marks and citations omitted).  For Medicare, specifically, "the tremendous complexity of the Medicare program enhances the deference due the Secretary's [interpretation]."  CommunityCare Foundation v. Thompson, 318 F.3d 219, 225 (D.C. Cir. 2003)(internal quotation

marks and citation omitted).  The high degree of deference due to the Secretary's interpretation of Medicare regulations extends to the PRM provisions, which are themselves interpretation of regulations.  <u>Shalala v. St. Paul-Ramsey Medical Ctr.</u>, 50 F.3d 522, 528 (8th Cir. 1995).

Under the "arbitrary, capricious ... abuse of discretion" standard, the court presumes the validity of agency action.  <u>See, e.g.</u>, <u>Davis v. Latschar</u>, 202 F.3d 359, 365 (D.C. Cir. 2000).  A reviewing court will not "substitute [its] judgment for that of the agency," but will, instead, uphold the decision as long the agency, in the decision, examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made."  <u>Sioux Valley Rural Television v. Fed. Commc'ns Comm'n</u>, 349 F.3d 667, 674 (D.C. Cir. 2003).

B.   <u>Application of the standards</u>

The issue in this case has been much more difficult to frame than it is to decide.

Under 42 C.F.R. § 413.134(f), the only disposals that gave rise to claims for depreciation gains or losses were those enumerated in subsection (f)(1)(sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty), and in subsection (l)(2)-(3) mergers and

consolidations between unrelated parties.  In CommunityCare's submission, it was the merger of Bates and Northwest – previously unrelated parties – that allowed the recognition of a disposal of assets here.  PRRB correctly argues, however, that because the lease was <u>terminated</u> rather than transferred in the transaction, the depreciation loss cannot be recognized.  The regulation allowed revaluation of "the assets of the merged corporation acquired by the surviving corporation" – a provision that PRRB found inapplicable when the surviving corporation did not acquire the leasehold from the merged corporation.  The lease could have been assigned, with the City of Bentonville's approval, Dkt. #9 at 927, but it was not.  It appears to be undisputed that Bates' termination of the lease did not fall under any of the  disposal categories recognized by § 413.134(f)(1).

The PRRB's findings that CommunityCare did not transfer depreciable assets through the merger, and that the assets transferred outside the merger were not eligible for depreciation gain or loss recognition, appear to be consistent with the 1996 regulations.  CommunityCare makes a fairness argument – that denying recognition of its depreciation loss yields a result inconsistent with the treatment of a nominal leaseholder as if it were the owner – but the Medicare regulation did not require CommunityCare's predecessor to terminate its lease with the city of Bentonville rather than transferring it.  In hindsight, the

decision to terminate was an unfortunate one, but I find nothing in the record to suggest that "an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation," or that the PRRB's decision lacks a "a rational connection between the facts found [and] the choice made." Sioux Valley, 349 F.3d at 674.  Because I cannot see how the PRRB's decision was "plainly erroneous or inconsistent with the regulation," Thomas Jefferson, 512 U.S. at 512, I must, and do, defer to the agency's interpretation.

*     *     *     *     *

An appropriate order accompanies ths memorandum.


JAMES ROBERTSON<br>United States District Judge